IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| IIITEC LIMITED, | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | CIVIL ACTION NO. H-19-3386 |
| | § | |
| WEATHERFORD TECHNOLOGY | § | |
| HOLDINGS, LLC, | § | |
| MARATHON OIL COMPANY, and | § | |
| IN-DEPTH SYSTEMS, INC., | § | |
| | § | |
| Defendants. | § | |

## MEMORANDUM OPINION AND ORDER

Plaintiff, iiiTec Limited, brings this action against defendants, Weatherford Technology Holdings, LLC ("Weatherford"), Marathon Oil Company ("MOC"), and In-Depth Systems, Inc. ("In-Depth"), seeking declaratory judgment that Weatherford does not have rights to any Assigned IP subject to iiiTec's exlcusive license (Count I), that iiiTec's exclusive license of the Assigned IP is valid and binds Weatherford (Count II), breach of contract (Count III), and attorney's fees (Count IV). Pending before the court are Plaintiff's Letter Brief in Support of an Implied License ("Plaintiff's Letter Brief") (Docket Entry No. 160), Defendants' Response to Plaintiff's Letter Brief ("Defendants' Response") (Docket Entry No. 161), and Plaintiff's Reply (Docket Entry No. 168). For the reasons stated below, the court concludes that defendants are entitled to summary judgment because Plaintiff has failed to cite evidence capable of establishing that MOC granted it an implied exclusive license to any Assigned IP.

## I. Background

MOC licensed Radio Frequency Identification Device ("RFID") technology to In-Depth Systems, Inc. ("In-Depth") pursuant to an agreement entered into as of May 3, 2001, an Addendum entered on April 7, 2006, and an Addendum No. 2 entered on April 26, 2010.[1]

In-Depth sub-licensed portions of the RFID technology licensed from MOC to Plaintiff pursuant to a License Agreement entered on January 30, 2007, and amended on November 1, 2007.[2] The portions of RFID technology that In-Depth sub-licensed to Plaintiff pertained to "RFID Reverse Application Drilling Assembly" and "RFID Reverse Application Methods".[3]

On August 19, 2008, Plaintiff entered into a Technology Development Agreement ("TDA") with MOC and Petrowell Limited ("Petrowell"),[4] pursuant to which MOC agreed to fund development of RFID technology with up to $20 million over a four-year period,[5] and Plaintiff and Petrowell, referred to collectively as

---

[1]Amended and Restated License Agreement by and between [MOC] and In-Depth, Docket Entry No. 98-1, pp. 2 ("entered into as of May 3, 2001), 27-29 (Addendum), 30-34 (Addendum No. 2). Page numbers for docket entries refer to the pagination inserted at the top of the page by the court's electronic filing system.

[2]See License Agreement, Docket Entry No. 98-13, pp. 37-40, and Docket Entry No. 98-14, pp. 2-19.

[3]Id. at §§ 1.03-1.04, Docket Entry No. 98-13, pp. 38-39.

[4]Docket Entry No. 1-2.

[5]Id. at § 2, Docket Entry No. 1-2, pp. 5-6.

"Developers,"[6] agreed that

> [a]ny IP that is conceived, originated or developed
> solely or jointly by any Developer Entity, with or
> without MOC and any third party, . . . and any IP that is
> derived by any Developer Entity from, arising out of, or
> relating to the RFID Technoloy or Confidential
> Information, shall belong to MOC and be owned solely by
> MOC, and the Developer Entities hereby assign to MOC all
> right, title and interest therein, including all interest
> in copyrights ("Assigned IP"). Accordingly, except as
> expressly set forth herein, no Developer Entity shall
> have rights to IP developed . . . or derived by any
> Developer Entity from, arising out of, or relating to the
> RFID Technology or Confidential Information. Developers
> shall develop, use, maintain and document policies,
> processes and systems approved by MOC to diligently
> protect MOC's rights in Assigned IP and to report the
> development of material Assigned IP to MOC. Developers
> shall provide MOC with access to such policies, processes
> and systems, and to documentation of Assigned IP, and
> shall include information regarding the same and its
> efforts to protect Assigned IP in annual reports and at
> MOC's request.[7]

The TDA also provided that

> MOC shall grant to In-Depth or Developers licenses in any
> Assigned IP ("Assigned IP Licenses"), depending on MOC's
> agreement with In-Depth and others. If assigned to
> Developers, the Assigned IP Licenses shall be exclusive
> to Petrowell in the Completion Field and to iiiTec in the
> Drilling Field or Coiled Tubing Field. . . iiiTec's
> Assigned IP Licenses will survive so long as the Drilling
> Field and Coiled Tubing Technology Development Fees are
> paid to MOC and iiiTec is otherwise in compliance with
> its obligations in this Agreement. The Assigned IP
> Licenses may be sublicensed by the Developers within

---

[6]Id. at 1. See also id. § 1.9, Docket Entry No. 1-2, p. 3
(defining "Developer Entities" to "mean[] both Developers, their
Affiliates and their collective Representatives, Contractors and
Licensees").

[7]Id. at § 9.6, Docket Entry No. 1-2, p. 13.

their respective fields.[8]

On August 25, 2008, MOC and In-Depth executed a Memorandum of Understanding ("MOU") stating, <u>inter alia,</u> that

> [t]o the extent that [MOC] receives intellectual property ownership pursuant to the program and licenses such intellectual property to In-Depth, In-Depth will promptly sub-license such intellectual property to Petrowell and iiiTec on the same basis as In-Depth currently licenses RFID technology (including reverse application technology) to Petrowell and iiiTec, but without any additional royalty or other fee.[9]

On May 5, 2009, Plaintiff and Weatherford Switzerland Trading and Development GmbH ("Weatherford Switzerland"), a Weatherford affiliate, entered into a Manufacturing and Distribution Agreement ("MDA"), pursuant to which Plaintiff granted Weatherford Switzerland and its affiliates a sub-license to all of Plaintiff's intellectual property relating to RFID, and Weatherford Switzerland agreed to pay Plaintiff a percentage of all tools sold or rented by Weatherford Switzerland or its affiliates to end users.[10]

In early 2013 Plaintiff paid MOC $ 290,801.24 explaining that

> [a]fter last year's transactions with Weatherford, Inc., we are now in a position to settle the Royalties due on the iiiTec RFID business.
>
> The royalties are derived wholly from the Manufacturing and Distribution Agreement between iiiTec and Weatherford Inc. . .

---

[8]<u>Id.</u> at § 9.9, Docket Entry No. 1-2, p. 14.

[9]Docket Entry No. 94-13, p. 2 ¶ 3.

[10]MDA, §§2.1, 3.1, Docket Entry No. 98-13, pp. 3-4, and 5.

4

Under the Technology Agreement iiiTec is due to pay [MOC] at a rate of 17.5%. This amounts to $ 290,801.24.[11]

In April 2017, MOC and Weatherford entered into an Intellectual Property Purchase Agreement ("IPPA"), pursuant to which MOC sold all of its "RFID Patents" and "RFID Technology" to Weatherford "subject to any and all rights and licenses granted" by MOC to others pursuant to certain contracts listed in the IPPA, including the TDA.[12] The IPPA also "assign[ed], transfer[red], and convey[ed] to [Weatherford] all of [MOC's] rights, interests, and obligations in and under" certain contracts that were "assignable without the consent of a third party."[13]

In early 2017, Plaintiff sued Weatherford Switzerland in Harris County District Court, claiming it was owed royalties under the MDA, the lawsuit was removed to this court, and dismissed for violation of the MDA's forum selection clause.[14]

On June 14, 2017, In-Depth sent Plaintiff a notice of breach advising Plaintiff that it owed $1.3 million in royalties pursuant to § 2.03 of the parties' license agreement, and when Plaintiff failed to make payment, In-Depth sent another letter terminating

---

[11]February 1, 2013, Email to MOC's Phil Snider ("Snider) from Plaintiff's Stuart Tait ("Tait"), Docket Entry No. 98-4.

[12]IPPA, §§ 2.1-2.2, Docket Entry No. 95-8, pp. 4-5.

[13]Id. at § 2.4, Docket Entry No. 95-8, p. 5, and Exhibit C thereto (listing contracts assigned to Weatherford).

[14]See Civil Action No. 4:18-1191, Docket Entry No. 81.

5

the license agreement.[15]    In-Depth then commenced arbitration against Plaintiff for breach of contract, and on October 17, 2019, arbitrators entered a final award in favor of In-Depth.[16]

On September 6, 2019, Plaintiff filed this action seeking declaratory judgment that the IPPA does not grant Weatherford rights to any Assigned IP subject to Plaintiff's exclusive license (Count I), or, in the alternative, that Plaintiff's exclusive license of the Assigned IP under the TDA is valid and binds Weatherford (Count II), damages, specific performance, and injunctive relief for Weatherford's breach of the TDA (Count III), and reasonable and necessary attorneys' fees pursuant to the Federal Declaratory Judgment Act (Count IV).[17]

After Plaintiff filed a Second Amended Complaint (Docket Entry No. 77) reasserting the same causes of action, Weatherford moved for summary judgment on all four counts (Docket Entry No. 93), and Plaintiff moved for summary judgment on Counts I and II (Docket Entry No. 97).  On December 1, 2020, the court entered a Memorandum and Order (Docket Entry No. 144) denying Plaintiff's motion for summary judgment on Counts I and II, and granting Weatherford's motion for summary judgment in limited part, holding that the TDA

---

[15]August 14, 2017, Letter from J. David Cabello to Tait, Thomas Doig ("Doig"), and Kelly Stephens, Docket Entry No. 115-6.

[16]Final Award of Arbitrators, International Center for Dispute Resolution, No. 01-18-0001-5994, Docket Entry No. 115-7.

[17]Original Complaint, Docket Entry No. 1-6, pp. 10-13.

did not provide Plaintiff an express license to Assigned IP,[18] and that MOC is a necessary party with respect to Counts I, II, and III.[19] The court denied Weatherford's motion for summary judgment on Counts I, II, and III because Weatherford failed to show beyond dispute that Plaintiff does not have an implied exclusive license to Assigned IP,[20] and that if Plaintiff has an implied exclusive license to Assigned IP, then Weatherford purchased the Assigned IP subject to that license.[21] The court denied as premature Weatherford's motion for summary judgment on Plaintiff's claim for attorney's fees asserted in Count IV.[22]

On December 15, 2020, Plaintiff filed its Third Amended Complaint (Docket Entry No. 146), adding MOC and In-Depth as defendants, and reasserting the same causes of action for declaratory judgment that Weatherford does not have rights to any Assigned IP subject to iiiTec's exclusive license (Count I), or, in the alternative, that Plaintiff's exclusive license of the Assigned IP is valid and binds Weatherford (Count II), breach of contract

---

[18]Memorandum and Order, Docket Entry No. 144, pp. 23-26.

[19]Id. at 47.

[20]Id. at 13-18.

[21]Id. at 37-39, and 43 ("genuine questions of material fact exist regarding whether [Plaintiff] was granted a license to the Assigned IP and whether Weatherford owns the Assigned IP subject to [Plaintiff's] rights").

[22]Id. at 47.

claim regarding the TDA (Count III), and reasonable and necessary attorneys' fees pursuant to the Federal Declaratory Judgment Act (Count IV).[23]

During the pre-trial conference held on December 17, 2020, the court informed Plaintiff that it had the burden of showing the existence and terms of its alleged implied exclusive license,[24] and ordered Plaintiff to submit an opening letter brief "in support of the creation and terms of an implied license."[25] The court ordered Defendants to file their own letter brief in support of their argument that no implied license exists, to which Plaintiff could reply.[26] On February 8, 2021, Plaintiff filed Plaintiff's Letter Brief (Docket Entry No. 160). On February 15, 2021, Defendants filed their Response in which they argue that "iiiTec's arguments in its Letter Brief should be rejected," and that "iiiTec has no exclusive implied license to Assigned IP from [MOC] as a matter of law and the Court should dismiss iiiTec's claims."[27] On February 23, 2021, Plaintiff filed its Reply (Docket Entry No. 168).

---

[23]Third Amended Complaint, Docket Entry No. 146, pp. 36-44.

[24]Transcript of Pretrial Conference, Docket Entry No. 152, pp. 29:1-31:13.

[25]Telephone Hearing Minutes and Order, Docket Entry No. 150.

[26]Id. See also Transcript of Pretrial Conference, Docket Entry No. 152, p. 31:6-8.

[27]Defendants' Response, Docket Entry No. 161, p. 19 ¶ 5.

The court reads Defendants' Response (Docket Entry No. 161) as a motion for summary judgment that Plaintiff is unable to cite evidence capable of establishing that it possesses an implied exclusive license to any Assigned IP.[28]

## II. **Standard of Review**

Summary judgment is authorized if the movant establishes that there is no genuine dispute about any material fact and the law entitles it to judgment. Fed. R. Civ. P. 56. See also Celotex Corp. v. Catrett, 106 S. Ct. 2548, 2552 (1986). Disputes about material facts are "genuine" if the evidence is such that a reasonable jury could return a verdict for the nonmoving party. Anderson v. Liberty Lobby, Inc., 106 S. Ct. 2505, 2510 (1986). A party moving for summary judgment "must 'demonstrate the absence of a genuine issue of material fact,' but need not negate the elements of the nonmovant's case." Little v. Liquid Air Corp., 37 F.3d 1069, 1075 (5th Cir. 1994) (en banc) (quoting Celotex, 106 S. Ct. at 2553)). If the moving party meets this burden, the nonmovant must go beyond the pleadings and show by admissible evidence that facts exist over which there is a genuine issue for trial. Id. Factual controversies are to be resolved in favor of the nonmovant, "but only when . . . both parties have submitted evidence of

---

[28]Id. at 1 ("iiiTec cannot meet its burden to prove that it has, or ever had, an implied exclusive license to the Assigned IP").

contradictory facts." Id. "[T]he court must draw all reasonable inferences in favor of the nonmoving party, and it may not make credibility determinations or weigh the evidence." Reeves v. Sanderson Plumbing Products, Inc., 120 S. Ct. 2097, 2110 (2000).

## III. **Analysis**

Asserting that "[t]his Court has already decided [that] the issue of an implied license is a fact question,"[29] and that "[t]he [parties'] correspondence and actions support [it's] claim [to an exclusive implied license],'"[30] Plaintiff argues that "the case should proceed to full discovery and trial."[31] Defendants respond that Plaintiff "cannot meet its burden to prove that it has, or ever had, an implied exclusive license to the Assigned IP."[32]

---

[29]Plaintiff's Letter Brief, Docket Entry No. 160, p. 1. See also Plaintiff's Reply, Docket Entry No. 168, p. 12 ("The ruling on the original summary judgment motion expressly states that the implied license is an issue of fact which requires weighing evidence.").

[30]Plaintiff's Letter Brief, Docket Entry No. 160, p. 5. See also Plaintiff's Reply, Docket Entry No. 168, p. 13 ("iiiTec's evidence establishes that all parties acted as if iiiTec had an exclusive license for coiled tubing and drilling fields;" "there is evidence which shows the parties intended for Marathon to make iiiTec its exclusive licensee to the TDA developments (Assigned IP)").

[31]Plaintiff's Letter Brief, Docket Entry No. 160, p. 12.

[32]Defendants' Response, Docket Entry No. 161, p. 1.

10

**A.  Applicable Law**

    1.  <u>Implied License</u>

Plaintiff's claim to an implied license to Assigned IP rests on the Federal Circuit Court's opinion in <u>Wang Laboratories, Inc. v. Mitsubishi Electronics America, Inc.</u>, 103 F.3d 1571 (Fed. Cir.), <u>cert. denied</u>, 118 S. Ct. 69 (1997), where the existence of an implied license was at issue.[33]  Wang sued Mitsubishi for patent infringement.  At trial Mitsubishi argued that Wang's conduct created an implied license under the patent in suit.  The parties agreed to submit Mitsubishi's implied license defense to the jury, which found that an implied license existed.  The district court entered judgment on the jury's verdict, adding the rationale that the implied license arose "under the doctrine of legal estoppel." <u>Id.</u> at 1578.  On appeal the Federal Circuit upheld the district court's judgment that Mitsubishi had an implied license, but held that the implied license was "in the nature of equitable rather than legal estoppel, because the license arose from an accord implicit in the entire course of conduct between the parties." <u>Id.</u> at 1582.

In reaching its decision the <u>Wang</u> court applied the following five-part test for determining whether a factual basis for an implied license exists:

    (1) a relationship existed between Wang and Mitsubishi,

---

[33]Plaintiff's Letter Brief, Docket Entry No. 160, p. 6.

(2) within that relationship, Wang granted to Mitsubishi a right to use its [intellectual property], (3) Wang received valuable consideration for that grant of right, (4) Wang denied that Mitsubishi had an implied license, and (5) Wang's statements and conduct created the impression that Wang consented to Mitsubishi making, using, or selling the patented inventions, including sales to consumers other than Wang.

Id. at 1579. See also Mass Engineered Design, Inc. v. Ergotron, Inc., 633 F. Supp. 2d 361, 388 (E.D. Tex. 2009) (applying the same five-part test to conclude that "the affirmative acts and 'course of conduct' between the parties . . . suggest an implied license"). Part three regarding consideration was the only element of the five-part factual basis test challenged in Wang. The Federal Circuit began its analysis by satisfying itself that substantial evidence in the record supported the jury's finding that the element of valuable consideration had been satisfied. Having determined that a factual basis existed for an implied license, the court analyzed whether established facts supported the legal conclusion that an implied license existed.

The court began its legal analysis by quoting the Supreme Court's opinion in De Forest Radio Telephone & Telegraph Co. v. United States, 47 S. Ct. 366, 367 (1927), stating that

[n]o formal granting of a license is necessary in order to give it effect. Any language used by the owner of the patent, or any conduct on his part exhibited to another, from which that other may properly infer that the owner consents to his use of the patent in making or using it, or selling it, upon which the other acts, constitutes a license and a defense to an action for a tort.

Wang, 103 F.3d at 1580. The court observed that

[s]ince De Forest, this court and others have attempted to identify and isolate various avenues to an implied license. As a result, courts and commentators relate that implied licenses arise by acquiescence, by conduct, by equitable estoppel (estoppel in pais), or by legal estoppel. . . These labels describe not different kinds of licenses, but rather different categories of conduct which lead to the same conclusion: an implied license. The label denotes the rationale for reaching the legal result.

. . . The opinions that hew most closely to the De Forest language and the "entire course of conduct" analysis rely on the doctrine of equitable estoppel, because De Forest requires that conduct of the patentee led the other to act. . .

Neither this court nor the Supreme Court, however, has required a formal finding of equitable estoppel as a prerequisite to a legal conclusion of implied license. . . To do so would remove all distinction between the doctrines. Rather the estoppel doctrines serve as guidelines. . . The primary difference between the estoppel analysis in implied license cases and the analysis in equitable estoppel cases is that implied license looks for an affirmative grant of consent or permission to make, use, or sell: i.e., a license. . . Equitable estoppel, on the other hand, focuses on "misleading" conduct suggesting that the patentee will not enforce patent rights. . . [A] typical equitable estoppel situation [i]s one in which (1) the infringer knows of the patent, (2) the patentee objects to the infringer's activities, (3) but the patentee does not seek relief until much later, (4) thereby misleading the infringer to believe the patentee will not act. . . Thus the two doctrines are not coterminous. . .

Legal estoppel refers to a narrower category of conduct encompassing scenarios where a patentee has licensed or assigned a right, received consideration, and then sought to derogate from the right granted. . .

Id. at 1580-81. Observing that whether an implied license exists is a legal conclusion, id. at 1580, and that "judicially implied licenses are rare under any doctrine," id. at 1581, the court

13

concluded that "Mitsubishi proved that the 'entire course of conduct' between the parties over a six-year period led Mitsubishi to infer consent to manufacture and sell the patented products." Id. at 1581-82. The burden of proving implied license rests on the party claiming an implied license. Augustine Medical, Inc. v. Progressive Dynamics, Inc., 194 F.3d 1367, 1370 & n. 2 (Fed. Cir. 1999) (noting plaintiff argued "that an implied license was created depriving [it] of its rightful property rights[; but that n]ormally, the accused infringer argues that an implied license exists in order to avoid infringement").

2.   Exclusive License

To be an exclusive licensee, a party must have received both the right to practice the invention within a given territory or field, and the patentee's express or implied promise that others shall be excluded from practicing the invention within that territory or field. See Rite-Hite Corp. v. Kelley Co., Inc., 56 F.3d 1538, 1552 (Fed. Cir.) (en banc), cert. denied, 116 S. Ct. 184 (1995) (citing Independent Wireless Telegraph Co. v. Radio Corp. of America, 46 S. Ct. 166, 169 (1926)).

> If the party has not received an express or implied promise of exclusivity under the patent, i.e., the right to exclude others from making, using, or selling the patented invention, the party has a "bare license," and has received only the patentee's promise that the party will not be sued for infringement.

Id.   "The grant of a bare license to sell an invention in a

14

specified territory [or field], even if it is the only license granted by the patentee, does not provide standing without the grant of a right to exclude others." Id. at 1553. See also Textile Products, Inc. v. Mead Corp., 134 F.3d 1481, 1483-84 (Fed. Cir. 1998) (describing the rights of an exclusive licensee to bring suit for patent infringement in its own name).

### 3. Texas Contract Law

"A license agreement is a contract governed by ordinary principles of state contract law." Power Lift, Inc. v. Weatherford Nipple-Up Systems, Inc., 871 F.2d 1082, 1085 (Fed. Cir. 1989). Citing § 28 of the TDA, which provides that "[t]he validity, construction, interpretation and effect of this Agreement will be governed by and interpreted in accordance with the laws of the United States and the State of Texas, USA, without regard to conflict rules which would otherwise apply the laws of another jurisdiction,"[34] Defendants argue that "Texas contract law . . . controls."[35] Plaintiff does not dispute the applicability of Texas contract law and, in fact, cites Texas case law in support of at least some of its arguments.[36]

---

[34] TDA, § 28, Docket Entry No. 1-2, p. 26.

[35] Defendants' Response, Docket Entry No. 161, p. 4.

[36] Plaintiff's Letter Brief, Docket Entry No. 160, pp. 6 and 9, and Plaintiff's Reply, Docket Entry No. 168, pp. 2, 5-6.

The Texas Supreme Court has explained that

> the distinction between an express contract and one
> implied in fact is that the former arises when the
> contractual terms are stated by the parties; and that the
> latter arises from the acts and conduct of the parties,
> it being implied from the facts and circumstances that
> there was a mutual intention to contract.

Haws & Garrett General Contractors, Inc. v. Gorbett Brothers

Welding Co., 480 S.W.2d 607, 609 (Tex. 1972). The Fifth Circuit

has stated that

> [u]nder Texas law, "[t]he elements of a contract, express
> or implied, are identical." Plotkin v. Joekel, 304
> S.W.3d 455, 476 (Tex. App.—Houston [1st Dist.] 2009, pet.
> denied) (internal quotation marks omitted). "[T]he real
> difference between express contracts and those implied in
> fact is in the character and manner of proof required to
> establish them." Id. at 476-77 (alteration in original)
> (internal quotation marks omitted). "[T]he elements of
> either type of contract are (1) an offer, (2) an
> acceptance, (3) a meeting of the minds, (4) each party's
> consent to the terms, and (5) execution and delivery of
> the contract with the intent that it be mutual and
> binding." Id. at 476 (internal quotation marks omitted).

Electrostim Medical Services, Inc. v. Health Care Service Corp.,

614 F. App'x 731, 744 (5th Cir. 2015) (per curiam).

> The determination of a meeting of the minds, and thus
> offer and acceptance, is based on the objective standard
> of what the parties said and did and not on their
> subjective state of mind. Additionally, consideration is
> a fundamental element of any valid contract.

Amco Energy, Inc. v. Tana Exploration Corp. (In re Capco Energy,

Inc.), 669 F.3d 274, 280 (5th Cir. 2012) (quoting Copeland v.

Alsobrook, 3 S.W.3d 598, 604 (Tex. App. — San Antonio 1999, pet.

denied)). See also Texas Farm Bureau Cotton Association v.

Stovall, 253 S.W. 1101, 1105 (Tex. 1923) ("The rule is simply that

a contract must be based upon a valid consideration, and that a contract in which there is no consideration moving from one party, or no obligation upon him, lacks mutuality, is unilateral, and unenforceable."). The Texas Supreme Court has explained that

> [c]onsideration is a present exchange bargained for in return for a promise. . . It consists of either a benefit to the promissor or a detriment to the promisee. . . The detriment must induce the making of the promise, and the promise must induce the incurring of the detriment.

Roark v. Stallworth Oil & Gas, Inc., 813 S.W.2d 492, 496 (Tex. 1991) (citations omitted).

To be legally binding a contract must be sufficiently definite in its terms so that a court can determine the respective legal obligations of the parties. Cole v. Sandel Medical Industries, L.L.C., 413 F. App'x 683, 686 (5th Cir. 2011) (per curiam) (citing Fort Worth I.S.D. v. City of Fort Worth, 22 S.W.3d 831, 846 (Tex. 2000)). "Texas courts have consistently held that a contract may be held void for indefiniteness if it fails to specify 'the time of performance, the price to be paid, the work to be done, the service to be rendered, or the property to be transferred.'" Liberto v. D.F. Stauffer Biscuit Co., 441 F.3d 318, 324 (5th Cir. 2006) (quoting University National Bank v. Ernst & Whinney, 773 S.W.2d 707, 710 (Tex. App. — San Antonio 1989, no writ)). "The rules regarding indefiniteness of material terms of a contract are based on the concept that a party cannot accept an offer so as to form a contract unless the terms of that contract are reasonably certain."

Cole, 413 F. App'x at 686 (quoting Fort Worth I.S.D., 22 S.W.3d at 846). "There is no authority to ask a jury to supply an essential term in the contract which the parties were unable to complete by mutual agreement." Richter, S.A. v. Bank of America National Trust and Savings Association, 939 F.2d 1176, 1196 (5th Cir. 1991) (quoting University National Bank, 773 S.W.2d at 710).

## B. Application of the Law to the Parties Arguments

### 1. The Court's Previous Ruling is Not Controlling

Citing the Memorandum and Order issued on December 1, 2020, Plaintiff argues that this action should proceed to discovery and trial because "[t]his Court has already decided the issue of an implied license is a fact question."[37] Defendants respond that "[t]he Court's Summary Judgment Order does not resolve the implied license issue,"[38] and that "[a]s a result, the Court ordered limited discovery on the implied license issue and ordered the parties to then brief the issue so that a resolution might be reached."[39]

---

[37]Plaintiff's Letter Brief, Docket Entry No. 160, p. 1. See also Plaintiff's Reply, Docket Entry No. 168, p. 12 ("The ruling on the original summary judgment motion expressly states that the implied license is an issue of fact which requires weighing evidence.").

[38]Defendants' Response, Docket Entry No. 161, p. 14.

[39]Id. See also Plaintiff's Letter Brief, Docket Entry No. 160, p. 1 ("Pursuant to this Court's Order (Doc. 150) and related hearing, iiiTec respectfully presents this letter brief in support of the creation and terms of an implied license in
(continued...)

18

The court's December 1, 2020, Memorandum and Order denying the parties' cross-motions for summary judgment was interlocutory, not final. <u>See Moody v. Seaside Lanes (In re Moody)</u>, 825 F.2d 81, 85 & n. 3 (5th Cir. 1987) ("finality is generally absent until the district court renders a decision that 'ends the litigation on the merits'"). Federal Rule of Civil Procedure 54(b) provides that "any order or other decision, however designated, that adjudicates fewer than all the claims or the rights and liabilities of fewer than all the parties . . . may be revised at any time before the entry of [a final judgment]." "Rule 54(b)'s approach to the interlocutory presentation of new arguments as the case evolves can be . . . flexible, reflecting the 'inherent power of the rendering district court to afford such relief from interlocutory judgments as justice requires.'" <u>Austin v. Kroger Texas, L.P.</u>, 864 F.3d 326, 337 (5th Cir. 2017) (per curiam) (quoting <u>Cobell v. Jewell</u>, 802 F.3d 12, 25 (D.C. Cir. 2015) (quoting <u>Greene v. Union Mutual Life Insurance Co. of America</u>, 764 F.2d 19, 22 (1st Cir. 1985)(Breyer, J.)). "[T]he power to reconsider or modify interlocutory rulings 'is committed to the discretion of the district court.'" <u>Id.</u> (citations omitted). <u>See also Moses H. Cone Memorial Hospital v. Mercury Construction Corp.</u>, 103 S. Ct. 927, 935 (1983) (noting that "every order short of a final decree is subject to reopening at the

---

[39](...continued)
favor of iiiTec.").

discretion of the district judge"). "[A] trial court [is] free to reconsider and reverse [interlocutory orders] for any reason it deems sufficient, even in the absence of new evidence or an intervening change in or clarification of the new law." Stoffels ex rel. SBC Telephone Concession Plan v. SBC Communications, Inc., 677 F.3d 720, 727-28 (5th Cir.), cert. denied, 113 S. Ct. 318 (2012). Moreover, "when a successor judge replaces another judge, '[t]he successor judge has the same discretion as the first judge to reconsider [the first judge's] order." Id. at 728. Accordingly, the court's prior ruling that the issue of implied license is a fact question is not controlling, and does not preclude the court from reconsidering the implied license issue.


2.  <u>Plaintiff Has Failed to Cite Evidence Capable of Establishing Either the Existence or Material Terms of an Implied Exclusive License</u>

Plaintiff argues that Defendants are not entitled to summary judgment that it did not have an implied exclusive license to Assigned IP because "[t]he [parties'] correspondence and actions support [its] claim [to an exclusive implied license]."[40] Asserting

_____

[40]Plaintiff's Letter Brief, Docket Entry No. 160, p. 5. See also Third Amended Complaint, Docket Entry No. 146, pp. 6 ¶ 18 (alleging that "the parties' intent was clear from the outset of the relationship, and carried forward to later conduct as to the fact that iiiTec would have exclusive market control over the entire portfolio of [MOC's] RFID technology for the drilling and coiled tubing fields"), 23-25 ¶¶ 75-80 (alleging "[t]he parties' conduct proves iiiTec's license"); Plaintiff's Reply, Docket
(continued...)

that Plaintiff's "claim of an alleged implied license falls apart when attempting to identify its terms,"[41] Defendants argue that there is no evidence of consideration or a meeting of the minds for an alleged implied exclusive license,[42] and that the alleged implied license fails for indefiniteness of material terms, particularly, effective date, duration, and terms for payment.[43]

> (a) Plaintiff Fails to Cite Evidence Capable of Establishing the Existence of an Implied License

Citing <u>Mass Engineered Design,</u> 633 F. Supp. 2d at 388, Plaintiff argues that the existence of an implied exclusive license is a fact issue for trial because

> [t]here is evidence that 1) there was an existing relationship between iiiTec and Marathon dating to at least 2006; 2) within that relationship, Marathon transferred a right to use the IP to iiiTec; 3) the IP rights were transferred for valuable consideration; 4) Marathon has now denied the existence of the right; and 5) Marathon's statements and conduct created the impression that it consented to iiiTec making, using, or selling the IP.[44]

---

[40](...continued)
Entry No. 168, p. 13 ("iiiTec's evidence establishes that all parties acted as if iiiTec had an exclusive license for coiled tubing and drilling fields;" "there is evidence which shows the parties intended for Marathon to make iiiTec its exclusive licensee to the TDA developments (Assigned IP)").

[41]Defendants' Response, Docket Entry No. 161, p. 4.

[42]<u>Id.</u> at 4-6 and 9.

[43]<u>Id.</u> at 6-9.

[44]Plaintiff's Letter Brief, Docket Entry No. 160, p. 6.

Plaintiff has cited the five-part Federal Circuit test for determining if a patentee has granted an implied license, see Wang, 103 F.3d at 1579, and has cited at least one item of evidence that it argues supports each element of that test.[45]  Defendants only seriously contest Plaintiff's ability to cite evidence capable of establishing element 3 of the five-part test, i.e., that MOC transferred to Plaintiff rights to the Assigned IP in exchange for valuable consideration.

As evidence that it provided MOC valuable consideration for an implied license to Assigned IP, Plaintiff cites a February 1, 2013, email from Tait, Plaintiff's CFO, to MOC's Snider,[46] stating that

[a]fter last year's transactions with Weatherford Inc., we are now in a position to settle the Royalties due on the iiiTEC RFID business.

The royalties are derived wholly from the Manufacturing and Distribution Agreement between iiiTec and Weatherford Inc. . .

Under the Technology Agreement iiiTec is due to pay Marathon at a rate of 17.5%.  This amounts to $ 290,801.24."[47]

Citing § 10.2 of the TDA, and Tait's deposition testimony, Defendants argue that paying technology development fees to MOC does not constitute consideration for the alleged implied exclusive

---

[45]Id. nn. 20-24.

[46]Id. n. 22 (citing Appendix 1 at 2/1/2013).

[47]February 1, 2013, email from Tait to Snider and Fraley, Docket Entry No. 98-4.

license because § 10.2 of the TDA obligated Plaintiff to pay those fees regardless of whether any Assigned IP was created or MOC granted Plaintiff a license to any Assigned IP.[48] Section 10.2 of the TDA states that "[Plaintiff] shall pay to [MOC] a technology development fee on the Gross Revenue of both sales or rental of all Exclusive Tools and Non-exclusive Tools related to the Drilling Field and the Coiled Tubing Field, regardless of [who] collects the price paid."[49] Tait testified that payment of technology development fees was a contractual obligation under the TDA:

> Q: So those technology development fees were owed by iiiTec to [MOC] pursuant to the terms of the [TDA], correct?
>
> A: Yes, that's correct.[50]

Plaintiff replies that "Defendants' consideration argument is based on express contract authorities and does not support its position."[51] Plaintiff argues that

> [w]hile the test for determining an implied license generally includes payment of consideration in exchange for a right to use, there is no authority that applies the contractual consideration principles to an implied license, a legal assumption to which Defendants leap, without support. In fact, in common implied license cases where the license is implied by a sale of a

---

[48]Defendants' Response, Docket Entry No. 161, p. 5.

[49]TDA, § 10.2, Docket Entry No. 1-2, p. 15.

[50]Oral and VideoTaped Deposition of Stuart Tait ("Tait Deposition"), Exhibit 1 to Defendants' Response, pp. 108:18-21, Docket Entry No. 167, pp. 29.

[51]Plaintiff's Reply, Docket Entry No. 168, p. 3.

product, the consideration paid is precisely for the purchase of the product to which the implied license attaches. <u>Met-Coil Systems Corp. v. Korners Unlimited, Inc.</u>, 803 F.2d 684, 687 (Fed. Cir. 1986). Whether the obligation to pay the fee comes at the outset of the transaction, or later on, is not relevant for purposes of finding an implied license exists.[52]

Plaintiff's argument that "there is no authority that applies the contractual consideration principles to an implied license," conflicts with both Texas contract law under which "[t]he elements of a contract, express or implied, are identical," <u>Plotkin</u>, 304 S.W.3d at 476, and "consideration is a fundamental element of any valid contract." <u>In re Capco Energy</u>, 669 F.3d at 280 (quoting <u>Copeland</u>, 3 S.W.3d at 604). <u>See also</u> <u>Stovall</u>, 253 S.W. at 1105 ("a contract must be based upon a valid consideration"). Plaintiff's argument also conflicts with the five-part test for determining the existence of an implied license applied by the Federal Circuit in <u>Wang</u>, 103 F.3d at 1579, which requires valuable consideration to be given in exchange for an implied license. In <u>Wang</u> the jury's finding that valuable consideration had been given was the only element of the five-part test challenged. <u>Id.</u> Only after the court concluded that substantial evidence of valuable consideration appeared in the record did the court consider the legal conclusion regarding the existence of an implied license. <u>Id.</u> at 1579-80.

In <u>Met-Coil</u> the Federal Circuit held that a "patent owner's unrestricted sale of a machine useful only in performing the

---

[52]<u>Id.</u> at 4.

24

claimed process or producing the claimed product" is a circumstance that "plainly indicate[s] that the grant of a license [to the claimed process or product] should be inferred." 803 F.2d at 687. But because Plaintiff's claim to an implied license is not based on Plaintiff's purchase of a process or product from MOC, payment for which would be valuable consideration for an implied license to use the process or product purchased, the facts of this case are not analogous to those at issue in Met-Coil.

The consideration that Plaintiff contends supports its implied license consists solely of the technology development fee of $ 290,801.24 that Plaintiff paid to MOC in early 2013 "derived wholly from the [MDA] between Plaintiff and Weatherford [Switzerland]."[53] Missing from Plaintiff's briefing is any argument or evidence from which a reasonable fact finder could conclude that Plaintiff paid the technology development fee to MOC in 2013 in exchange for an implied license to Assigned IP. To the contrary, undisputed evidence shows that the TDA executed in 2008 contractually obligated Plaintiff to pay a technology development fee to MOC on the gross revenue of both sales and rental of all tools related to the Drilling Field and the Coiled Tubing Field regardless of who collected the payment. Because consideration requires a present exchange, payment of the fee that Plaintiff was

---

[53]See February 1, 2013, Email from Stuart Tait to Philip Snider, Docket Entry No. 98-4.

25

obligated to make under the TDA cannot serve as consideration for another contract, i.e., an implied license for Assigned IP. See Roark, 813 S.W.2d at 496-97 (recognizing that fulfillment of a pre-existing obligation cannot serve as consideration for a new or different contract). Accordingly, the court concludes that Plaintiff has failed to cite evidence capable of establishing the element of consideration required to establish the existence of an implied license to Assigned IP. See Wang, 103 F.3d at 1579.

### (b) Plaintiff Has Failed to Cite Evidence Capable of Establishing Material Terms of an Implied License

Asserting that the court

> issued an Order requiring [Plaintiff] to submit an opening letter brief "in support of the creation and terms of an implied license," [and that d]espite this clear direction and Order from the Court, nowhere in its Opening L[etter] B[rief] does [Plaintiff] attempt to set forth the terms of its alleged implied license,[54]

Defendants argue that "[t]his . . . is not an oversight by [Plaintiff because Plaintiff's] claim of an alleged implied license falls apart when attempting to identify its terms."[55] Defendants argue, therefore, that Plaintiff's alleged implied exclusive license to Assigned IP from MOC fails for indefiniteness of material terms and for failure to establish a meeting of the

---

[54]Defendants' Response, Docket Entry No. 161, p. 4.

[55]Id.

minds.[56]    In  support  of  this  argument,  Defendants  assert  that
Plaintiff  "has  repeatedly  admitted  in  discovery  that  it  cannot
identify  the  effective  date  of  its  alleged  implied  license,"[57]  that
the  overall  duration  of  the  alleged  implied  license  is  undefined,[58]
and  the  alleged  payment  term  is  impermissible.[59]

   Asserting  that  like  Defendants'  argument  about  consideration,
"Defendants'  argument  about  lack  of  material  contract  terms  also
looks  to  authorities  covering  express  contracts,"[60]  Plaintiff  argues
that  "[w]hat  is  .  .  .  relevant  is  the  property  owner's  intent
through  the  entire  course  of  dealing,  including  the  TDA,  and  the
extent  that  the  license  must  be  extended  in  order  to  give  the
dealings  validity."[61]    Plaintiff  contends  that  "[t]here  is  no
meeting  of  minds  obligation,  but  the  parties  did  have  a  mutual
understanding  that  iiiTec  was  to  be  the  exclusive  licensee  for
drilling  and  coiled  tubing  RFID  tools."[62]    Plaintiff  argues  that  the
authorities  on  which  Defendants  rely

   do  not  stand  for  the  proposition  that  implied  license
   terms  must  be  expressly  agreed  between  the  parties.    Such

---

[56]Id. at 6-9.

[57]Id. at 6.

[58]Id. at 7-8.

[59]Id. at 8-9.

[60]Plaintiff's Reply, Docket Entry No. 168, p. 4.

[61]Id. at 5.

[62]Id. at 6.

a requirement would create an express, not an implied
        license. Defendants are not entitled to judgment that no
        implied license exists based on the fact that no express
        license exists.[63]

        Plaintiff's argument conflicts with Texas law under which

"[t]he elements of a contract, express or implied, are identical,"

and the difference between express and implied contracts "is in the

character and manner of proof required to establish them."

Plotkin, 304 S.W.3d at 476.  In the case of an implied contract,

the element of mutual agreement is inferred from the circumstances,

and a meeting of the minds is implied from and evidenced by the

parties' conduct and course of dealing.  Haws & Garrett, 480 S.W.2d

at 609.  See also Klebe v. United States, 44 S. Ct. 58, 59 (1923)

("A contract implied in fact is one inferred from the circumstances

or acts of the parties; but an express contract speaks for itself

and leaves no place for implications."); Bitmanagement Software

GmBH v. United States, 989 F.3d 938, 948 (Fed. Cir. 2021) (quoting

Baltimore & Ohio Railroad Co. v. United States, 43 S. Ct. 425, 426-

27 (1923)("[A]n implied-in-fact license may be found only 'upon a

meeting of the minds' that 'is inferred, as a fact, from conduct of

the parties showing, in the light of the surrounding circumstances,

their tacit understanding.'")).

        The difference in the character and manner of proof required

to establish the existence and terms of an implied contract do not

_____

        [63]Id. at 5.

                                28

relieve Plaintiff of the need to cite evidence capable of establishing the terms. Instead of pointing to any particular actions or conduct from which a reasonable fact finder could infer either terms of the alleged implied license or each party's mutual assent to those terms, Plaintiff argues that the "[t]erms of an implied license are [to be] determined by the court in order to match the level of estoppel required by the facts of the case."[64] But Plaintiff fails to cite, and the court has failed to find, any authority allowing either a jury or the court to supply terms to a contract the parties were unable to complete by mutual agreement. See Richter, 939 F.2d at 1196 (quoting University National Bank, 773 S.W.2d at 710).

Moreover, as evidenced by the deposition testimony of Plaintiff's CFO, Tait, Plaintiff is unable to identifying either an effective date or a period of duration for its alleged implied license. Regarding the effective date, Tait testified:

Q: . . . So the date that the license, the Exclusive Implied License to Assigned IP that you're claiming to have received from [MOC] was created is irrelevant?

A: That's what we're saying.[65]

. . .

Q: So you can't identify — iiiTec can't identify a

_____

[64]Id. at 3.

[65]Tait Deposition, p. 276:9-13, Docket Entry No. 167, p. 109.

> specific date that the Implied License was created,
> it was just some date during the seven year
> timeframe from 2006 through 2013, correct?

A:    Yes.[66]

Defendants argue, and the court agrees, that a meeting of the

minds cannot exist with respect to an effective date that Plaintiff

is unable to identify more specifically than some time from 2006 to

2013.[67]

Regarding the implied license's duration, Plaintiff's Third

Amended Complaint alleges that

> 56.  iiiTec's licenses to the Assigned IP last "so long
> as the Drilling Field and Coiled Tubing Field
> Technology Development Fees are paid to MOC and
> iiiTec is otherwise in compliance with its
> obligations. . . This is consistent with the
> parties overall intent in the related
> transactions.[68]

Yet, in response to interrogatories Plaintiff stated that

> iiiTec's implied license from [MOC] to the Assigned IP
> lasts for the life of the patent(s) for all developed
> RFID IP in iiiTec's respective fields of use, which
> fields are the drilling and coiled tubing fields . . .
> so long as the . . . Technology Development Fees are paid
> to [MOC] and iiiTec is otherwise in compliance with its
> obligations under the TDA.[69]

---

[66]Id. at 279:9-16, Docket Entry No. 167, p. 108.

[67]Defendants' Response, Docket Entry No. 161, p. 9.

[68]Third Amended Complaint, Docket Entry No. 146, p. 18 ¶ 56
(quoting TDA, § 9.9, Docket Entry No. 1-2, p. 14).

[69]Plaintiff iiiTec Limited's Objections and Responses to
Defendant's Second Set of Interrogatories, Answer to
Interrogatory No. 1, Exhibit 4 to Defendants' Response, Docket
<span style="float:right">(continued...)</span>

When asked which duration term is accurate, Tait testified that there were two schools of thought and that iiiTec had an either/or position on that issue:

> Q: So which — which duration term is accurate, the — the duration term set forth in Paragraph 56 of the Third Amended Complaint or the duration term set forth in the first paragraph of your response to Interrogatory No. 1?
>
> MR. LODHOLZ: Object to form.
>
> A: I can understand your question. I can only say that there are — there have been two schools of thought about this, and it looks as if we're covering both of our bases on this one.
>
> Q: . . . So iiiTec doesn't have a firm position on what the duration of the alleged Exclusive Implied License to Assign IP from [MOC] is?
>
> MR. LODHOLZ: Object to form.
>
> A: I think you would have to say that iiiTec has an either/or position here.[70]

Defendants argue, and the court agrees, that a meeting of the minds cannot exist with respect to the duration of an alleged implied license when Plaintiff is taking an "either/or" position because Plaintiff "cannot form a meeting of the minds internally on which of multiple schools of thought to follow on the duration of the alleged implied license."[71]

---

[69](...continued)
Entry No. 162-4, p. 5.

[70]Tait Deposition, pp. 67:19-68:11, Docket Entry No. 167, pp. 15-16.

[71]Defendants' Response, Docket Entry No. 161, p. 9.

Regarding the implied license's payment terms, Plaintiff's Third Amended Complaint alleges that

> 57. iiiTec is only required to pay the development fee until [MOC] receives (from all Developers collectively) return of the development funds, or until the total amount paid equals $23.7 Million.[72]

The allegations in ¶ 57 of the Third Amended Complaint conflict with the express terms of the TDA, pursuant to which MOC was to "provide funds of up to US$20 million,"[73] and the Developers, _i.e._, Plaintiff and Petrowell, were to "pay Fees to MOC for the term of the Agreement or until the total amount of Fees paid to MOC equals US$23.7MM, whichever occurs first."[74] According to Plaintiff's allegations in § 57 of the Third Amended Complaint, the implied license changed the developers' obligation by reducing the total amount of technology development fees to be paid to MOC to the amount of development funds advanced, _i.e._, US$20 million, instead of the US$23.7 million required under § 10.5.

Missing from Plaintiff's briefing is any argument or evidence that MOC ever took any action from which a reasonable fact finder could infer that MOC agreed to the change in payment terms alleged in ¶ 57 of the Third Amended Complaint. Moreover, since § 22 of the TDA states that "[t]his Agreement may not be amended except in

---

[72]Third Amended Complaint, Docket Entry No. 146, p. 18 ¶ 57 (quoting TDA, § 10.4, Docket Entry No. 1-2, p. 16).

[73]TDA, § 2, Docket Entry No. 1-2, p. 5.

[74]_Id._ § 10.5, Docket Entry No. 1-2, p. 16.

writing signed by authorized representatives of the Parties hereto,"[75] and Tait testified that Plaintiff has no writing signed by authorized representatives of Parties as required by § 22 agreeing to the payment terms alleged in ¶ 57 of the Third Amended Complaint,[76] the alleged payment terms of the implied license represent an impermissible attempt to change the parties' express agreement. See Bitmanagement, 989 F.3d at 949 ("the existence of an express contract precludes the existence of an implied-in-fact contract dealing with the same subject matter, unless the implied contract is entirely unrelated to the express contract").

Defendants argue, and the court agrees, that a meeting of the minds cannot exist with respect to the payment terms of its alleged implied license because the alleged payment terms of the implied license violate § 22 of the TDA.[77]

Because Plaintiff has not only failed to cite evidence capable of establishing the effective date, duration, or payment terms of the alleged implied license, but also acknowledged that it does not know the effective date, duration, or payment terms of the alleged implied license, the court concludes that Plaintiff is unable to cite evidence capable of establishing material terms of the alleged implied license.

---

[75]Id. § 22, Docket Entry No. 1-2, p. 25.

[76]Tait Deposition, pp. 80:20-81:7, Docket Entry No. 167, pp. 19-20.

[77]Defendants' Response, Docket Entry No. 161, p. 9.

33

(c)   Plaintiff Has Failed to Cite Evidence Capable of
                          Establishing that Any Implied License was Exclusive

Plaintiff argues that

> [a]s set out in Appendix 1, from the initiation of work
> involving iiiTec and [MOC] (around November 2006), [MOC]
> repeatedly and consistently referred to iiiTec as its
> "partner," its "exclusive" licensee or partner, and as
> controlling or having control over the drilling field
> licenses for the relevant RFID intellectual property.[78]

Appendix 1 cites a November 21, 2006, letter from MOC to Plaintiff
stating that "it is everyone's full intent to finalize license
agreements, including multi-year exclusivity to iiiTec for the
drilling applications in the RFID patent portfolio;"[79] an August 8,
2007, communication from MOC's Snider stating that "iiiTec and
Petrowell are essentially our exclusive business partners in the
primary part of the portfolio that is coming to market;"[80] an August
15, 2007, communication discussing a planned meeting with
Weatherford in which Snider states that "the main message we plan
to give Weatherford is [that] Petrowell and iiiTec are our
exclusive partners on the majority of the patent portfolio,"[81] a
November 9, 2008, presentation prepared for Weatherford in which
MOC represented that Petrowell and iiiTec had licenses "for

---

[78]Plaintiff's Letter Brief, Docket Entry No. 160, p. 6.

[79]Appendix 1 to Plaintiff's Letter Brief, Docket Entry
No. 160, p. 13.

[80]Id.

[81]Id. at 14.

completion and drilling applications respectively;"[82] and a November 23, 2010, email string in which Plaintiff's Doig stated that the "technology we use is under license from Marathon" and MOC's Snider responded that "Tom is correct."[83]

Whether considered alone or collectively, the evidence cited by Plaintiff is not sufficient to establish that any implied license MOC granted Plaintiff included the right to exclude others from selling or practicing the Assigned IP. See Rite-Hite, 56 F.3d at 1552-53 ("[A] bare license to sell [or practice] an invention in a specified territory [or field], even if it is the only license granted by the patentee, does not provide standing without the grant of a right to exclude others."). The communications that pre-date the execution of the TDA in August of 2008 merely reflect MOC's willingness to enter an agreement with Plaintiff, which MOC did by executing the TDA. This conclusion is corroborated by § 22 of the TDA, which states that

> [t]his Agreement represents the entire agreement of the Parties with respect to the matters set forth herein, and replaces and supersedes all prior communications, understandings and agreements between the parties, whether oral or written, expressed or implied with respect to the matters addressed herein.[84]

The communications that post-date the execution of the TDA in

---

[82]Id. at 15.

[83]Id.

[84]TDA § 22, Docket Entry No. 1-2, p. 24.

August of 2008 do not mention Assigned IP or Plaintiff's ability to exclude others from using any licensed technology. Instead, they merely reflect that Plaintiff had a license to use MOC technology for drilling applications.[85] Moreover, undisputed evidence establishes that In-Depth granted Plaintiff a license to use MOC's technology for drilling applications in 2006, and that license remained in effect until 2017 when In-Depth terminated it for non-payment. Accordingly, the court concludes that the cited communications that post-date the execution of the TDA are not sufficient to establish that Plaintiff possessed an implied exclusive license to the Assigned IP.

### (d) Conclusions

The evidence that Plaintiff cites in support of its claim to an implied exclusive license is distinguishable from the evidence in Wang, which led the court to conclude that "the 'entire course of conduct' between the parties over a six-year period led Mitsubishi to infer consent to manufacture and sell the patented products." 103 F.3d at 1581-82. The Wang court explained that

> [t]he record shows that Wang tried to coax Mitsubishi into the SIMM market, that Wang provided designs, suggestions, and samples to Mitsubishi, and that Wang eventually purchased SIMMs from Mitsubishi, before accusing Mitsubishi years later of infringement. We hold as a matter of law, that Mitsubishi properly inferred consent to its use of the invention of Wang's patents.

---

[85] Id.

36

> The findings that Wang bestowed "a right to use the SIMM invention" and that Mitsubishi supplied valuable consideration to Wang, support our holding that Wang's conduct created a license. This falls short of the express licenses or assignments usually discussed in conjunction with legal estoppel, but it constitutes part of a course of conduct that transcends "unilateral expectations . . . of one party." . . Wang not only led Mitsubishi to infer consent, Wang obtained payment. . . In sum, Wang consented to Mitsubishi's use of the invention, granted the right to make, use, or sell the patented SIMMs without interference from Wang, and received consideration. Therefore, we agree with the district court's determination . . . that Mitsubishi possesses an irrevocable royalty-free license under the '513 patent.

Id. at 1582.

Plaintiff has failed to cite evidence capable of establishing that MOC licensed or assigned to Plaintiff a right to the Assigned IP, received consideration, and then sought to deny Plaintiff the right granted. To the contrary, for the reasons stated in § III.B.2(a), above, the court has concluded that Plaintiff failed to cite evidence capable of establishing that MOC received any valuable consideration in exchange for the alleged implied license. Nor has Plaintiff cited evidence capable of establishing that MOC engaged in conduct from which Plaintiff could reasonably infer that MOC consented to Plaintiff's use of the Assigned IP absent an express license from either MOC or In-Depth.

Quoting Tait, Plaintiff argues that its "position is that the implied license is based on 'the whole body and conduct of the parties over the period of time,'" and that "'having conducted our business with [MOC] for ten years, we were working in the belief

that we had a license to the Assigned IP.'"[86]   But Plaintiff is

unable to point to any course of conduct from which a reasonable

fact finder could infer either the existence or terms of an implied

license to Assigned IP.   Instead, Plaintiff's claim to an implied

license to Assigned IP is based wholly on the text of the TDA, a

single payment of a technology development fee made in 2013, and a

few informal communications in which MOC's Snider confirmed

representations made by Plaintiff that Plaintiff was licensed to

MOC's RFID technology.   Because Plaintiff was licensed to MOC's

RFID technology pursuant to the express license that Plaintiff held

from In-Depth until 2017 when In-Depth terminated that license for

non-payment, Snider's communications confirming that Plaintiff was

licensed to MOC's RFID technology do not provide a sufficient basis

for the court to conclude that MOC granted Plaintiff an implied

license to the Assigned IP referenced in the TDA.   Moreover, for

the reasons stated in §§ III.B.2(b)-(c), above, the court has

concluded that Plaintiff also failed to cite evidence capable of

establishing either the existence or material terms of the alleged

implied license, or that the alleged implied license gave Plaintiff

the right to exclude others and assert claims in its own name.   The

court therefore concludes that Plaintiff is unable to carry of its

burden of proving that MOC granted it an implied exclusive license.

---

[86]Plaintiff's Reply, Docket Entry No. 168, p. 6 (quoting
Oral and VideoTaped Deposition of Stuart Tait, pp. 30:10-31:22,
Exhibit E to Plaintiff's Reply, Docket Entry No. 169-1, pp. 10-
11).

C. **Application of the Court's Implied License Conclusions to the Claims Asserted in Plaintiff's Third Amended Complaint**

Plaintiff's Third Amended Complaint (Docket Entry No. 146), reasserts the same claims asserted in the Second Amended Complaint, and addressed in the court's December 1, 2020, Memorandum and Opinion (Docket Entry No. 144), *i.e.*, claims for declaratory judgment (Counts I and II), a claim for breach of contract regarding the TDA (Count III), and a claim for attorney's fees pursuant to the Federal Declaratory Judgment Act (Count IV).[87]

The court's December 1, 2020, Memorandum and Opinion denied Defendants' motion for summary judgment on Plaintiff's two claims for Declaratory Judgment and breach of contract claim (Counts I-III) based on conclusions that Weatherford failed to show beyond dispute that Plaintiff does not have an implied exclusive license to Assigned IP.[88] The court denied as premature Weatherford's motion for summary judgment on the claim asserted in Count IV for attorney's fees pursuant to the Declaratory Judgment Act.[89] The court's conclusion that Plaintiff is unable to carry its burden of proving that MOC granted it an implied exclusive license to the Assigned IP is dispositive of the claims that Plaintiff has asserted in this action. Absent an implied exclusive license to

---

[87]Third Amended Complaint, Docket Entry No. 146, pp. 36-44.

[88]*Id.* at 13-18.

[89]*Id.* at 47.

the Assigned IP, Plaintiff lacks either constitutional or prudential standing to seek Declaratory Judgment that Weatherford does not have rights to any "Assigned IP" subject to iiiTec's exclusive license (Count I), or, alternatively, that Plaintiff's exclusive license of the "Assigned IP" is valid and binds Weatherford (Count II),[90] and, therefore, cannot be entitled to attorney's fees pursuant to the Federal Declaratory Judgment Act (Count IV).[91] Absent an implied exclusive license to the Assigned IP, Plaintiff also lacks standing to assert a claim for breach of contract regarding the TDA (Count III).[92] Accordingly, the court concludes that Defendants are entitled to summary judgment on all of Plaintiff's claims because Plaintiff is unable to carry of its burden of proving that MOC granted it an implied exclusive license to the Assigned IP.

## IV.  Conclusions and Order

For the reasons stated in § III.B, above, the court concludes that Plaintiff has failed to cite evidence capable of establishing that MOC granted Plaintiff an implied exclusive license to the Assigned IP referenced in the TDA executed by Plaintiff and MOC.

---

[90]Memorandum Opinion and Order, Docket Entry No. 144, pp. 12-18, 23-24, and 37.

[91]Id. at 43.

[92]Id. at 39-41.

For the reasons stated in § III.C, above, the court concludes that Plaintiff lacks either constitutional or prudential standing to assert its claims for Declaratory Judgment, breach of contract regarding the TDA, and attorney's fees pursuant to the Federal Declaratory Judgment Act. Defendants are, therefore, entitled to summary judgment on all of the claims asserted in the Third Amended Complaint. Accordingly, Defendants' request for dismissal of Plaintiff's claims asserted at p. 19 ¶ 5 of Defendants' Response to Plaintiff's Letter Brief which the court reads as a motion for summary judgment, Docket Entry No. 161, is **GRANTED**.

**SIGNED** at Houston, Texas, on this the 25th day of June, 2021.

SIM LAKE
SENIOR UNITED STATES DISTRICT JUDGE

41